UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | |
|---|---|
| CODY LLOYD, )<br>       Plaintiff, )<br>)<br>v. )<br>)<br>CAROLYN W. COLVIN, )<br>Acting Commissioner, )<br>Social Security Administration, )<br>       Defendant. ) | Civil Action No. 4:14cv00040<br><br>**REPORT & RECOMMENDATION**<br><br>By:    Joel C. Hoppe<br>United States Magistrate Judge |

Plaintiff Cody Lloyd asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision holding that he was no longer disabled and terminating his benefits for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' briefs, and the applicable law, I find that the Commissioner's final decision is not supported by substantial evidence. The decision should be reversed and the case remanded under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

1

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person under age 18 is "disabled" if he or she has a "medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.906. Once that person turns 18, the Commissioner must reevaluate the person's medical condition to determine whether he or she is entitled to SSI under the adult disability standard.[1] 42 U.S.C. § 1382c(a)(3)(H)(iii); 20

---

[1] An adult is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). The fact that a person was found disabled under the childhood standard does not mean that he or she will be found disabled under the adulthood standard. *See* 20 C.F.R. § 987(a)(2); *Dennison v. Comm'r of Soc. Sec.*, No. 2:12cv39, 2014 WL 293912, at *2 (W.D. Va. Jan. 27, 2014); *Lewis v. Comm'r of Soc. Sec.*, No. 1:09cv2450, 2011 WL 334850, at *6 (N.D. Ohio Jan. 31, 2011) ("[The] childhood disability finding is not dispositive []or binding on the adult determination.").

C.F.R. § 416.987. Social Security ALJs follow a four-step process in age-18 redeterminations. The ALJ asks, in sequence, whether the young adult: (1) has a severe impairment; (2) has an impairment that meets or equals an impairment listed in the Act's regulations; (3) can return to his or her past relevant work, if any, based on his or her residual functional capacity; and if not, (4) can perform work that exists in the economy.[2] *See* 20 C.F.R. § 416.987(b) (citing 20 C.F.R. § 416.920(c)–(h)). The claimant bears the burden of proof at steps one through three. *See Dennison*, 2014 WL 293912, at *2. At step four, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Lloyd was born on March 31, 1993, with spina bifida,[3] underdeveloped lower extremities, and bilateral clubbed feet. *See* Administrative Record ("R.") 272, 300. In September

---

[2] This is an abbreviated version of the five-step framework applied to adults who file new applications for SSI. *See* 20 C.F.R. § 416.987(b). The agency in these cases "will not use" the eight-step framework set out in 20 C.F.R. § 416.994 for determining whether a person's disability "continues." *Id.*; *see also* 42 U.S.C. § 1382c(a)(3)(H). Thus, the Commissioner "is not required to show any medical improvement to terminate benefits" in age-18 redetermination cases. *Dennison*, 2014 WL 293912, at *2 (citing 20 C.F.R. § 416.987(b)); *Wagner v. Comm'r of Soc. Sec.*, No. 1:09cv1115, 2010 WL 3036763, at *3 (N.D. Ohio July 15, 2010) ("Medical improvement is not a factor for consideration since the concept of redetermination is to treat the transition to adult SSI as a new application.").

[3] Spina bifida is a congenital neural tube defect affecting the "embryonic structure that eventually develops into the baby's brain and spinal cord and the tissues that enclose them." Mayo Clinic, *Spina Bifida: Definition*, Aug. 27, 2014, http://www.mayoclinic.org/diseases-conditions/spina-bifida/basics/definition/con-20035356. "In babies with spina bifida, a portion of the neural tube fails to develop or close properly, causing defects in the spinal cord and in the bones of the spine." *Id.* Spina bifida diagnoses are classified by severity: spina bifida occulta, meningocele, and myelomeningocele. Mayo Clinic, *Spina Bifida: Symptoms*, Aug. 27, 2014, http://www.mayoclinic.org/diseases-conditions/spina-bifida/basics/symptoms/con-20035356. Most children with spina bifida occulta "have no signs or symptoms and experience no neurological problems" because this defect causes only a "small separation or gap in one or more" vertebrae without involving the spinal nerves. *Id.* Spina bifida myelomeningocele, or "open spina bifida," is the most severe form. *Id.* "In myelomeningocele, the baby's spinal canal remains open along several vertebrae in the lower or middle back," which causes "both the membranes and the spinal cord [to] protrude at birth." *Id.* Children with myelomeningocele often

1996, the agency found that Lloyd was disabled by spina bifida and awarded him childhood SSI effective June 1, 1996. *See* R. 63. The agency conducted routine continuing disability reviews ("CDR")[4] in July 2000, R. 246; September 2004, R. 61, 244–45, 250–51; and May 2005, R. 59. Lloyd's benefits continued after each CDR because reviewers determined that his spina bifida myelomeningocele met childhood Listing 111.08A—i.e., he exhibited "persistent disorganization or deficit of motor function for [his] age involving two extremities which (despite prescribed therapy) interfere[d] with age-appropriate major daily activity and result[ed] in disruption of: [f]ine and gross movements[] or [g]ait and station." *See* R. 18, 246 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 111.08A).

As part of the redetermination, Lloyd submitted a Disability Report for adult SSI in August 2011. *See* R. 180–88. He alleged disability beginning March 31, 1993, because of spina bifida, "pencil legs" secondary to spina bifida, "no feeling" in his feet secondary to clubbed feet, and incontinence. R. 183. On February 23, 2012, the agency informed Lloyd that it was terminating his benefits because those conditions were "not severe enough to keep [him] from working" as of February 1, 2012. R. 71; *see also* R. 64, 66, 308–11. A state-agency disability hearing officer denied Lloyd's application upon reconsideration after a hearing in June 2012. *See* R. 86–97, 102, 105–11.

Lloyd appeared with a non-attorney representative at a hearing before an ALJ on January 10, 2013. R. 31. He testified about his birth defects and the limitations his symptoms caused in

---

experience neurological defects including muscle weakness in the legs, bowel or bladder problems, and orthopedic problems such as deformed feet, uneven hips, and scoliosis. *Id.*

[4] The Act requires the agency to review periodically a disabled child's condition to determine whether the child's entitlement to SSI ceased because he or she experienced a "medical improvement" in a once-disabling impairment. 42 U.S.C. § 1382c(a)(4)(B); 20 C.F.R. § 416.994a; *see also Wagner*, 2010 WL 3036763, at *2–3 (explaining the difference between childhood CDRs and age-18 redeterminations).

his daily activities. *See* R. 34–51. A vocational expert ("VE") also testified as to Lloyd's ability to perform work existing in the economy. R. 52–56.

The ALJ denied Lloyd's application in a written decision dated February 8, 2013.[5] R. 16–23. He found that Lloyd suffered from severe spina bifida, but that the impairment did not meet or equal a listed impairment. R. 18–19. The ALJ next determined that Lloyd had the residual functional capacity ("RFC") to perform "sedentary work"[6] that "allowed the flexibility to alternate between sitting and standing while remaining on task"; only occasionally required balancing, stooping, or climbing ramps and stairs; never required crouching, crawling, or climbing ladders, ropes, or scaffolds; and did not involve "concentrated exposure" to workplace hazards like unprotected heights and machinery. R. 19. Finally, relying on the VE's testimony, the ALJ concluded that Lloyd was not disabled after February 1, 2012, because he could perform certain jobs available nationally and in Virginia, such as receptionist, office clerk, and order

---

[5] The ALJ erroneously evaluated Lloyd's application using the eight-step analysis set out in 20 C.F.R. § 416.994(b)(5) for determining whether an adult's disability continues. R. 17–23. Because this is an age-18 redetermination case, R. 107, the ALJ should have evaluated Lloyd's application using the analysis set out in 20 C.F.R. § 416.920(c)–(h) for determining whether an adult is disabled in the first instance. 42 U.S.C. § 1382c(a)(3)(H); 20 C.F.R. § 416.987. The ALJ's error is harmless, however, because the former standard incorporates "the substance of the rules set out in" the latter standard. *Faint v. Colvin*, 26 F. Supp. 3d 896, 908 (E.D. Mo. 2014) (explaining that the ALJ's "superfluous use of § 416.994" was harmless in the plaintiff's age-18 redetermination because the substance of his analysis "complie[d] with the dictates of 20 C.F.R. § 416.987"); *see also Kersey v. Astrue*, 614 F. Supp. 2d 679, 696 (W.D. Va. 2009) ("Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error."). Though the ALJ's discussion of medical improvement has no application to an age-18 redetermination, the Court will consider the ALJ's rationale as much of it nonetheless fits within the proper legal framework.

[6] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. § 416.967(a). A person who can meet those lifting requirements can perform a full range of sedentary work if he can sit for about six hours and stand and walk for about two hours in a normal eight-hour workday. *See Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002) (Kiser, J.); SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996).

clerk. R. 22. The Appeals Council declined to review that decision, R. 1, and this appeal followed.

III. Discussion

Lloyd primarily challenges the ALJ's finding that Lloyd's spina bifida does not meet a listed impairment.[7] *See* Pl. Br. 17–19, ECF No. 18. The Listings are examples of medical conditions that "ordinarily prevent a person from working" in any capacity. *Sullivan v. Zebley*, 493 U.S. 521, 533 (1990); *see also* 20 C.F.R. § 416.925(a). A claimant's severe impairment "meets" a listing if it "satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the [one-year] duration requirement." 20 C.F.R. § 416.925(c)(3); *Zebley*, 493 U.S. at 530.

An adult claimant whose severe medically determinable impairment meets a listing is presumed disabled regardless of his or her vocational profile. 20 C.F.R. § 416.925(c). Thus, proving "listing-level severity" requires the claimant to demonstrate a greater degree of physical or mental impairment than the baseline statutory standard of being unable to perform "substantial gainful activity." *Zebley*, 493 U.S. at 532. A claimant who can satisfy a listing, however, "is entitled to a *conclusive* presumption that he is disabled." *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (emphasis added) (citing *Bowen v. City of N.Y.*, 476 U.S. 467, 471 (1986)); *accord* 20 C.F.R. § 416.920(a)(4)(iii). Thus, the ALJ generally must identify the relevant listed

---

[7] Lloyd also objects to the ALJ's RFC determination and to the ALJ's finding that Lloyd experienced a "medical improvement" as of February 1, 2012. The latter objection is irrelevant because the Commissioner was not required to show any medical improvement to terminate Lloyd's benefits when he turned 18 years old. 42 U.S.C. § 1382c(a)(3)(H); 20 C.F.R. § 987(b); *Dennison*, 2014 WL 293912, at *2. On remand, the Commissioner will have another chance to properly evaluate and explain Lloyd's RFC based on all the relevant evidence in his record. *See* 20 C.F.R. § 416.1483.

impairments and "compare[] each of the listed criteria" to the medical evidence in the claimant's record. *Cook v. Heckler*, 782 F.2d 1168, 1173 (4th Cir. 1986); *see also Radford*, 734 F.3d at 295.

A.  Relevant Listings

Adults with "spina bifida[,] diastematomyelia, [or] tethered cord syndrome . . . are to be evaluated under the criteria in 11.00ff," 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00(K)(4), the categorical listing for adult neurological disorders. *Hibbard v. Comm'r Soc. Sec.*, No. 1:11cv599, 2012 WL 3262732, at * 11-12 (S.D. Ohio Aug. 9, 2012). The ALJ in this case applied the correct standard in evaluating Lloyd's physical impairments under Listing 11.08. *See* R. 18.

To meet that listing, Lloyd needed to produce medical evidence of "spinal cord or nerve root lesions, due to any cause with disorganization of motor function as described in 11.04B." 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.08. Listing 11.04B in turn requires evidence of "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." *Id.* § 11.04B (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.00C). An introductory comment applicable to all neurological-impairment listings advises agency decision-makers that

> persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment.

*Id.* § 11.00C. Thus, "[t]he assessment of whether the listing requirement is met for any of those conditions 'depends on the degree of interference with locomotion and/or interference with the use of fingers, hands[,] and arms.'" *Backman v. Colvin*, No. 4:12cv1897, 2014 WL 798356, at *6 (D.S.C. Feb. 27, 2014) (quoting 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.00C).

7

Lloyd argues that the ALJ should have used the definition of "To ambulate effectively" from Listing 1.00(b)(2)(B). Pl. Br. 17–19. I disagree and find that the more specific listing described above applies in this case.

B.   Relevant Evidence

Lloyd's medical records document a lifelong history of neurological complications and orthopedic abnormalities secondary to diastematomyelia,[8] spina bifida with tethered-cord syndrome, and bilateral clubbed feet. *See, e.g.*, R. 269–74 (birth); R. 263 (age 3); R. 260–61 (age 7); R. 248–49, 277, 280, 281 (ages 11–13); R. 284–85, 299–303, 305, 331, 386, 396, 404–07 (ages 17–19). He has had multiple surgeries on his spine and feet, including one lumbosacral laminectomy, two procedures to untether his spinal cord, and three foot and ankle surgeries. *See* R. 261, 266, 280–81, 284, 301, 406. Lloyd has also worn solid ankle-foot orthotics ("AFO") on both legs since at least age 11 to help him walk independently, albeit still with an "ataxic" and "abnormal" gait. R. 303; *see also* R. 248–49, 277, 404.

On February 11, 2012, Lloyd visited Amy Marshall, M.D., for a consultative interview and physical examination. R. 299–305. Reviewing Lloyd's medical records, Dr. Marshall noted that Lloyd was born with bilateral clubbed feet and diastematomyelia at T10-12 with a tethered cord at L4 "resulting in weakness of the lower extremity, bladder dysfunction[,] . . . [an] abnormal gait," and "impairment of protective sensation in his feet." R. 299–300 (citing R. 269–74, 284–85). On exam, Dr. Marshall observed that Lloyd wore "bilateral braces with lifts in his shoes secondary to unequal leg" length. R. 301. Lloyd walked with an "ataxic" and "abnormal"

---

[8] Diastematomyelia is "a congenital defect, often associated with spina bifida, in which the spinal cord is split into halves by a long spicule or fibrous band, [with] each half being surrounded by a dural sac." *Dorland's Illustrated Medical Dictionary* 518 (31st ed. 2007). Lloyd's medical records indicate that diastematomyelia is characterized by spinal cord lesions. *See* R. 272–73; *accord Dorland's* at 1039 (defining the term "lesion" as "any pathological or traumatic discontinuity of tissue or loss of function of a part").

8

tandem gait. R. 303. His "heel and toe walking [was] significantly abnormal with imbalance." *Id.* Dr. Marshall described "significant atrophy" in Lloyd's gastrocnemius (calf) muscles bilaterally, resulting in "pencil legs," as well as "significant malformation" and "decreased sensation" in both feet. R. 302–03. She also observed that Lloyd could not dorsiflex (i.e., bend up and down) either ankle and had at least 50% reduced plantarflexion, eversion, and inversion ranges of motion in both ankles. R. 302, 305. Lloyd had "no noted reflexes in the knee jerk or ankle jerk bilaterally" and decreased strength bilaterally below the knee. R. 303. His upper extremities were normal. *See* R. 302–03, 305.

Based on her examination, Dr. Marshall opined that, during an eight-hour workday, Lloyd could stand for two hours; walk for fewer than two hours; sit for eight hours; occasionally carry 25 pounds and frequently carry 10 pounds; and occasionally bend, stoop, crouch, or squat. R. 303–04. Dr. Marshall explained that these restrictions were necessary to accommodate Lloyd's "significant inability due to leg strength," bilateral leg deformities, and decreased range of motion in both ankles. *Id.* She also recommended that, in addition to his leg braces, Lloyd should use a wheelchair or walker to accommodate "his significant imbalance and fatigue with prolonged walking." R. 304.

On February 23, 2012, state-agency medical consultant Wyatt Beazley, M.D., reviewed Lloyd's SSI application in light of Dr. Marshall's recent physical examination; a February 15, 2011, diagnostic letter from Lloyd's orthopedic surgeon; and a March 9, 2011, diagnostic letter from Lloyd's neurosurgeon. *See* R. 308–11, 313–14 (citing R. 284–85, 301–05). Dr. Beazley opined that Lloyd suffered from spina bifida meningomyelocele and bilateral clubbed feet. R. 64, 306. It is not clear that Dr. Beazley also considered whether those medically determinable impairments, alone or combined, met or equaled a listed impairment. *See* R. 64, 306–14.

9

Dr. Beazley opined that, during an eight-hour workday, Lloyd could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds; stand and/or walk for two hours; sit for about six hours with normal breaks; occasionally balance, stoop, kneel, crouch, or crawl; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to workplace hazards like unprotected heights and machinery. R. 308–10. *See* R. 313–14.

One month later, state-agency medical consultant Catherine Howard, M.D., reviewed Lloyd's records. R. 320–27. Dr. Howard imposed stricter limitations on Lloyd's functional abilities than did Dr. Beazley. *Compare* R. 321–24, *with* R. 308–10. For example, Dr. Howard opined that Lloyd could only occasionally lift or carry 10 pounds; never kneel, crouch, or crawl; and had "limited" ability to push and pull with his lower extremities. R. 321–22. She concurred with the other physical restrictions that Dr. Beazley diagnosed. R. 321–24. It is not clear that Dr. Howard considered whether Lloyd's spina bifida and clubbed feet met or equaled a listed impairment. *See* R. 320–27.

On April 11, 2012, Lloyd visited Dr. Mark Abel, M.D., for a routine follow-up orthopedic appointment. R. 406–07. Dr. Abel noted that his clinic "last saw [Lloyd] in 2010 at which time he was having balance issues and back pain." R. 406. An MRI of Lloyd's brain "showed no hydrocephalous or chiari malformation" at that time. *Id.*; *accord* R. 386, 388, 391. On this visit, Lloyd reported that he was "doing reasonably well" and that "his balance ha[d] improved to some degree," but that his "back continue[d] to bother him . . . especially when he walks for long periods of time." *Id.*

An X-ray taken that day showed an uneven pelvis, scoliosis of thoracic and lumbar spine, and "spinal segmentation anomalies in multiple lumbar vertebrae and postsurgical findings of

10

laminectomy." R. 408. Dr. Abel assessed mechanical lower-back pain, leg-length discrepancy, impaired sensation in the feet, and limited endurance. R. 407. He recommended "core conditioning and stretching" for the lower-back pain and instructed Lloyd to follow up as needed. *Id.* On May 9, 2012, Lloyd received new shoe lifts to level his pelvis and was fitted for new bilateral solid AFOs. R. 404.

In June 2012, state-agency disability hearing officer Evelyn Funn reviewed Lloyd's application as part of his age-18 redetermination. *See* R. 86–97, 105–11. After a hearing, Funn agreed with Drs. Beazley and Howard, *see* R. 108, that Lloyd's childhood disability "ceased" in February 2012 because he did "not meet the adult criteria for disability," R. 105. In particular, Funn determined that Lloyd's spina bifida meningomyelocele was "not attended by all of the findings specified for such impairments included in Section 11.08 or 11.14 of the Listings," and that "the reported clinical findings and laboratory test results" did not show that Lloyd had "an impairment of the severity contemplated" for any listing. R. 109. Funn determined that Lloyd could perform a full range of sedentary work. R. 107.

Lloyd visited his treating pediatrician, Larry Smith, M.D., on December 10, 2012. R. 417. He explained that he was there "to get disability due to his spina bifida."[9] *Id.* Lloyd "denie[d] having any pain," and he did not report any symptoms or functional limitations related to his spina bifida. *Id.* Dr. Smith observed that Lloyd's posture and gait were normal. R. 418. He did not perform in-depth neurological or musculoskeletal exams. *See* R. 417–18.

---

[9] Lloyd also visited Dr. Smith for routine healthcare 11 times between February 1, 2010, and February 24, 2012. R. 343. Dr. Smith's treatment notes do not document any abnormal findings or symptoms related to spina bifida or clubbed feet; instead, the notes document treatment for other complaints. *See generally* R. 344–46 (abdominal pain), 349–51 (well child exam, wisdom teeth pre-operation), 353–55 (cough), 357–59 (concussion), 360–61 (concussion), 363–64 (cold), 366–68 (sore throat), 370–71 (sore throat), 373–74 (shoulder pain), 376 (hip pain).

Dr. Smith explained that Lloyd's diastematomyelia and clubbed feet caused muscle weakness in both legs, mechanical back pain, reduced sensation in the feet, "significantly reduced" range of motion, "fatigue on exertion," and "very limited endurance." R. 414. He said that Lloyd did not need to use a cane or other assistive devices when "engaging in occasional walking/standing." R. 415. Nonetheless, Dr. Smith opined that Lloyd "cannot work 8 hours" because he can sit and stand or walk for fewer than two hours each in an eight-hour day. Even then, Lloyd would be absent from work "20+ times [a] month." R. 415–16.

C. *The ALJ's Findings*

The ALJ found that Lloyd's severe spina bifida did not meet or equal the criteria in Listing 11.08. *See* R. 18. In support of that finding, the ALJ noted that "[n]o treating or examining physician ha[d] identified medical signs or findings that meet or medically equal the requirements of any" listing, and that the "DDS medical consultants, who are skilled in reviewing records and in assessing the impairments and limitations therein, concluded that [Lloyd's] impairments did not meet or equal the requirements of any" listed impairment. *Id.* Thus, the ALJ concluded that "the evidence fail[ed] to establish" that Lloyd's spina bifida was "accompanied by the signs reflective of listing level severity." *Id.*

D. *Analysis*

"A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling." *Radford*, 734 F.3d at 295. The decision must include a discussion of which evidence the ALJ found credible and why, *id.*, the reasons the ALJ rejected any "obviously probative" conflicting evidence, *see Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977), "and specific application of the pertinent legal requirements to the record evidence," *Radford*, 734 F.3d at 295. "If the reviewing court has no way of evaluating the basis

12

for the ALJ's decision, then 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Radford*, 734 F.3d at 295 (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).

The ALJ's conclusion that Lloyd's spina bifida does not meet Listing 11.08 is devoid of reasoning. First, the ALJ made that finding without comparing a single listing-level criterion to the relevant medical evidence in Lloyd's record, R. 18, 20–21. *See Radford*, 734 F.3d at 295; *Cook*, 782 F.2d at 1173. Contrary to the Commissioner's argument, the ALJ did not find—much less explain—that Lloyd's spina bifida "no longer met" Listing 11.08 "because the medical findings established that his condition did not significantly interfere with his fine and gross movements, gait, or station," Def. Br. 13. *See* R. 18. He found only that "the evidence fail[ed] to establish an impairment or combination of impairments that is accompanied by the signs reflective of listing level severity." R. 18. The ALJ cited the DDS medical consultants' (purported) "opinions in support of his conclusion, but that is not enough to constitute 'substantial evidence.' Even if the ALJ's exclusive citation to those opinions indicates the (apparently) very high evidentiary weight he placed on them, it does not indicate why the opinions merit that weight." *Radford*, 734 F.3d at 295 (emphasis omitted). Moreover, the DDS physicians did not explicitly address whether Lloyd met a listing during the redetermination. At most, they made an implicit finding, which adds no support to the ALJ's rationale for his listing analysis.

Second, the ALJ's finding that "[n]o treating or examining physician ha[d] identified medical signs or findings that meet or medically equal the requirements" of any listed impairment, R. 18, contradicts probative evidence that the ALJ did not discuss in his decision. In April 2012, for example, an X-ray confirmed the presence of "unchanged spinal segmentation

anomalies in multiple lumbar vertebrae," R. 408, which corresponds to Lloyd's tethered spinal cord at L4 and diastematomyelia—or split spinal cord—from T10 through T12. *See* R. 299. Dr. Abel noted that Lloyd's balance had "improved to some degree," compared to August 2010 when he was losing his balance once a day, and he still had limited sensation in his feet. R. 393; *see also* R. 386. In February 2012, Dr. Marshall observed on exam that Lloyd had "significant atrophy" of both calf muscles, "significant deformities" and "reduced sensation" in both feet, and walked with an "ataxic" and "abnormal" gait. R. 302–03. Dr. Marshall's findings are consistent with multiple treating, examining, and reviewing physicians' findings that Lloyd's diastematomyelia and bilateral clubbed feet have long impaired his gait, station, and locomotion. *See, e.g.*, R. 263 (age 3); 246, 260–61 (age 7); 249, 277 (age 11); R. 386 (age 17).

The ALJ should have considered these medical signs and findings in determining whether Lloyd's spina bifida caused "significant and persistent disorganization of motor dysfunction in two extremities, resulting in sustained disturbance of . . . gait and station," 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.04B, "in the form of . . . ataxia and sensory disturbances" that significantly "interfered with his locomotion," *id.* § 11.00C. *See Treadwell v. Colvin*, No. 5:13cv370-FL, 2014 WL 4656852, at *10 (E.D.N.C. Aug. 25, 2014) ("Where evidence predating the onset of disability is relevant to an issue in the case, the ALJ should consider that evidence in making a determination on the issue."); 20 C.F.R. § 416.920(a)(3). His failure to do so undermines his conclusion that Lloyd's spina bifida is not "accompanied by the signs" that meet or medically equal Listing 11.08. *See Arnold*, 567 F.2d at 259.

The ALJ's failure to mention Dr. Marshall's findings as to Lloyd's abnormal station and gait is particularly problematic in this case because he ultimately "adopted" her opinions about Lloyd's ability to stand and walk. R. 21, 303–04. Dr. Marshall explained that the restrictions in

14

her RFC assessment were necessary to accommodate Lloyd's "significant inability due to leg strength[,] deformities," and "decreased range of motion" in both lower extremities. R. 303–04. If the ALJ rejected the medical signs and findings underlying Dr. Marshall's functional assessment, then "he needed to both say so and to explain why." *Smith v. Heckler*, 782 F.2d 1176, 1181 (4th Cir. 1986); *cf. Warren v. Astrue*, No. 2:08cv3, 2008 WL 3285756, at *11 (W.D. Va. Aug. 8, 2008) ("The ALJ's decision cannot be supported by substantial evidence when he fails to adequately explain his rationale for rejecting the opinions of those whom he otherwise gave great weight to in arriving at his decision.").

Courts review legal errors in social security cases to determine whether they could have changed the Commissioner's final decision that the claimant is not disabled. *Reid*, 769 F.3d at 865; *Kersey*, 614 F. Supp. 2d at 696. Errors at step three may be harmless where an adequately developed record "overwhelmingly support[s]" the Commissioner's decision not to award benefits at that step even though the ALJ's written determination "failed to marshal that support," *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014) (quoting *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)), or where the ALJ's specific and adequately supported factual findings at other steps of the process conclusively rule out finding that the claimant meets or equals the listing in question, *see, e.g.*, *Fischer-Ross v. Barnhart*, 431 F.3d 729, 734 (10th Cir. 2005); *Vest v. Astrue*, No. 5:11cv47, 2012 WL 450310, at *3 (W.D. Va. Sept. 28, 2012).

Lloyd's "record includes a fair amount of evidence supportive of his claim," *Radford*, 734 F.3d at 295, that his spinal cord lesions cause "significant and persistent disorganization of motor function" in both lower extremities "resulting in sustained disturbance of gross and dexterous movements, *or gait and station*," 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.04B (emphasis added). But it also includes evidence that Lloyd's spina bifida does not interfere at all

15

with his manual dexterity, R. 303–04, and that his problems with motor function might not be as "significant and persistent" as he claims, *see, e.g.*, R. 351, 358–59, 393.

Under § 11.00C, the assessment of whether Lloyd's impairment meets Listing 11.08 "depends on the degree of interference with locomotion *and/or* interference with the use of fingers, hands, and arms." 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.00 (emphasis added). This disjunctive language leaves open the possibility that Lloyd could meet Listing 11.08 even though his spina bifida does not interfere with manual dexterity. "Given the depth and ambivalence of the medical record, the ALJ's failure to adequately explain his reasoning [at step three] precludes" meaningful judicial review of the Commissioner's final decision that Lloyd's spina bifida is not disabling under the adult standard. *Radford*, 734 F.3d at 296. Just as it is not this Court's "province to reweigh conflicting evidence . . . or substitute [its] judgment for that of the ALJ," it also is not this Court's province to undertake these tasks in the first instance. *Id.* (brackets omitted).

## IV. Conclusion

The ALJ's analysis at step three was deficient, and, considering the significant evidence that supports Lloyd's claim, I cannot find that it was harmless. Accordingly, I find that the Commissioner's decision is not supported by substantial evidence. I therefore recommend that the presiding District Judge grant Lloyd's motion for summary judgment, ECF No. 17, deny the Commissioner's motion for summary judgment, ECF No. 19, and remand the case under sentence four of 42 U.S.C. § 405(g) for further proceedings.

### **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such

> proposed findings and recommendations as provided by rules of court. A judge of
> the court shall make a de novo determination of those portions of the report or
> specified proposed findings or recommendations to which objection is made. A
> judge of the court may accept, reject, or modify, in whole or in part, the findings
> or recommendations made by the magistrate judge. The judge may also receive
> further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: September 4, 2015

*/s/ Joel C. Hoppe*

Joel C. Hoppe
United States Magistrate Judge